

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN, TEXAS 78711

WAGGONER CARR
ATTORNEY GENERAL

June 2, 1966

Hon. D. C. Greer
State Highway Engineer
Texas Highway Department
Austin, Texas

Opinion No. C-702

Re: Whether firms which
provide TV cable ser-
vice have the right to
place their cables a-
long State Highways
within the highway right
of way.

Dear Mr. Greer:

By letter you state that the Texas Highway Depart-
ment has been approached by firms which provide TV cable
service, concerning the placement of their cables along State
Highways. You advise that these firms generally install re-
ceiving antennas at some high area where the signals from
television broadcast stations can be picked up. The signals
may then be relayed by micro-wave to a community distributor
antenna, and thence by cable to subscribers to the service.
The use of State Highways by the cable is of concern to the
Texas Highway Department.

The question which you present is as follows: "Un-
der the laws of the State of Texas, do firms which provide
TV cable service have a right to place their cables along
State Highways within the highway right of way?"

If such firms which provide TV cable service do
have a right to place their cables along State Highways with-
in the highway right of way, this right must be derived from
Article 1416, Vernon's Civil Statutes, which provides:

"Corporations created for the purpose of constructing
and maintaining magnetic telegraph lines, are authorized
to set their poles, piers, abutments, wires and other
fixtures along, upon, and across any of the public roads,
streets and waters of this State, in such manner as not
to incommode the public in the use of such roads, streets
and waters." Acts 1874, p. 132; G.L. vol. 8, p. 134.

In the absence of statutory authority, a corporation contemplated by Article 1416 could not place its cables along State Highways within the highway right of way. Alice, Wade City & C. C. Tel. Co. v. Billingsley, 77 S.W. 255 (Tex. Civ.App. 1903, error ref.). The authority must be granted directly by the legislature or by municipal authorities pursuant to express or implied powers delegated to the municipality. 86 C.J.S. 32, Telegrams, Telegraphs, Radio, and Television, Sec. 24; 54 Tex.Jur.2d 598, Telegraphs and Telephones, Sec. 6; p. 632, Sec. 32.

The controlling legal question presented is whether Article 1416 is broad enough in scope and meaning to include corporations providing TV cable service.

Our Supreme Court, in San Antonio & A. P. Ry. Co. v. Southwestern Telegraph & Telephone Co., 93 Tex. 313, 55 S.W. 117 (1900) did not apply a strict, technical, or narrow construction to the statute in question, but gave it a reasonable, practical, and liberal construction to carry out the legislative purpose. In holding that the statutory phrase "magnetic telegraph lines" was broad enough to include the "telephone," the Court pointed out that at the time of the original passage of the statute, telephones had not been invented, and said:

". . . (they) were not generally known, and it cannot be supposed that the Legislature had telephones in mind when it used the word 'telegraph.' However, the fact that the telephone was not then in contemplation of the legislature does not control the construction of Article 642, subd. 8; for if the language used is broad enough to embrace a subsequently developed method, the later invention might be controlled by the pre-existing law, as if it had been in existence at the time the law was made . . ."

Quoting from the English case of Attorney General v. Edison Telephone Co., 6 Q.B.Div. 254, 255, the Supreme Court of Texas in the San Antonio & A. & P. Ry. Co. case, supra, proceeded to give a broad legal definition of what is embraced in the meaning of "telegraph" as used in the statute:

"The result of the definition seems to be that any apparatus for transmitting messages by electric signals is a telegraph, whether a wire is used or not, and that

any apparatus of which a wire used for telegraphic com-
munications is an essential part is a telegraph, whether
communication is made by electricity or not."

In accord, see Gulf, C. &. S. F. Ry. Co. v. South-
western Telegraph & Telephone Co., 45 S.W. 151 (Tex.Civ.App.
1898, no writ history), in which the Court stated the pur-
pose of the legislature in the statute was to provide for
"the transmission of messages by wires acted on by electri-
city."

In construing the statute in question, it is also
pertinent to observe that it is in the public interest in re-
ceiving utility services that gives rise to the right of such
public utility companies to use the roads and streets. State
v. Dallas, 319 S.W.2d 767 (Tex.Civ.App. 1959, no writ his-
tory). Even a "de facto" telephone corporation may take ad-
vantage of Article 1416, supra. Roaring Springs Townsite
Co. v. Paducah Tel. Co., 164 S.W. 50 (Tex.Civ.App. 1914, no
writ history).

This office, in Opinion No. WW-1417 (1962), had
occasion to construe the meaning of "telegraph lines" as used
in the same statute, in the light of the above cases, and it
was held that the statute was broad enough to include tele-
vision lines, which transmit messages by wires acted on by
electricity. The basis of our holding was that television
was a "communication system of the same nature as the tele-
phone system, but on a more limited scale and with pictures
added; i.e., it is merely an advancement or improvement in
the art of telegraphy and telephony, with the same purpose
of transmitting messages by wires acted on by electricity."

Since the issuance of our Opinion WW-1417 on Au-
gust 17, 1962, the Supreme Court of Arkansas, on Dec. 3,
1962, in Independent Theatre Owners v. Arkansas Public Ser-
vice Commission, 235 Ark. 668, 361 S.W.2d 642 (1962), handed
down a similar opinion in which the authorities of other
jurisdictions were reviewed, concluding that television ca-
ble service provides a telephonic or telegraphic communica-
tion service within the nature, purpose and meaning of the
latter. The court said that, "television transmission is
an integral part of the telephone and telegraph business as
it has developed and now exists." It therefore held that the
Public Service Commission had jurisdiction to require the
telephone company to furnish its facilities for purpose of

television, since the sending of an electrical impulse over a cable owned by the telephone company producing a picture or sound was a system of "conveying a message or communication by telephone or telegraph" within the statute making such service a public utility and subjecting it to regulation by the commission.

Distinguishing the case of Television Transmission, Inc. v. Public Utility Commission, 47 Cal.2d 82, 301 P.2d 862 (1956) on the ground of different statutory language or purpose, the Court quoted at page 645 from In re New York Telephone Co., 34 P.U.R.3d 115, in which it was said that a conclusion as to jurisdiction by the Public Service Commission

". . . cannot be made to depend upon the type of system used; i.e., coaxial cable or ordinary telephone wires, but must be based on a determination whether thereby a telephonic or telegraphic communication service is being provided. We think one is. It is clear that the telephone company is undertaking to transmit intelligence from one point to another for the benefit of a subscriber, using principles of telephony (or telegraphy). It proposes to provide this service upon similar terms to one and all seeking it. The company's filing of a tariff covering the service was proper."

The Court further observed:

"In Ohio Telephone and Telegraph Co. v. Steen, Ohio Com.Pl., 85 N.E.2d 579, it is said: 'The court is also of the opinion . . . that the transmission of television is merely an advance or improvement in the art of telegraphy and telephony and therefore the right of eminent domain for telegraph and telephone purposes . . . is applicable to television.'

"In Ball v. American Telephone and Telegraph Co., 227 Miss. 218, 86 So.2d 42, the Mississippi Court said: 'Television is but one of the many scientific achievements of the past few decades made possible by developments of the carrier art. Some of the others are radio, teletype, and the photo-telegraph, each of which employs electrical impulses in transmission. All of these de-

vices to some extent make use of cables and wires in the transmission process. Transmission techniques developed by or as an adjunct of the telephone business has made possible the services performed by these devices. We should not construe the eminent domain statutes so as to require the telephone and telegraph companies to secure new easements for every new device that employs the use of electrical impulses even when the new device performs a function other than the transmission of sound or articulate voice. To do so would lead to absurd and unreasonable results. We conclude that television transmission is an integral part of the telephone and telegraph business as it has developed and now exists.'"

Article 1416 is broad enough in language, purpose, and scope to include television corporations created for the purpose of transmitting intelligence by electricity or "messages by electric signals," and "whether a wire is used or not," as was held in the San Antonio & A. P. Ry Co. case, supra.

In an interesting annotation on the legal aspects of television, we find this comment in 15 A.L.R.2d 785, at pages 797-798:

"Rejecting the defendant's contention that the purpose of the plaintiff telephone company in seeking to condemn a line across his property was primarily for the purpose of installing a coaxial cable for television rather than for telephone and telegraph purposes, the court in Ohio Tel. & Tel. Co. v. Steen (1949) 85 N.E.2d 579, 54 Ohio L.Abs. 114, said that it was convinced from the evidence that the primary purpose for the installation of the cable was to provide telephone and telegraph circuits, and in addition to these uses it no doubt would be used in the future for television purposes, adding that since the transmission of television was merely an advancement in the art of telegraphy and telephony the right of eminent domain for such purposes conferred by the statute was applicable to television, since statutes granting the right of eminent domain, while strictly construed, should not be so technically or unreasonably interpreted as to interfere with the normal business of a utility and the development of the service which it rendered to the public."

Hon. D. C. Greer, page 6 (C-702)


From the authorities heretofore cited, it is apparent that corporations providing TV cable service are public utilities in contemplation of law and subject to regulation as well as the rights conferred under Articles 1416 through 1532, Vernon's Civil Statutes. A corporation organized for public service and affected by the public interest is regarded as a public utility, whether or not expressly declared so by the legislature. 47 Tex.Jur.2d 391, Public Utilities & Service, Sec. 1.

We therefore answer your question that under Articles 1416, et. seq., corporations created for the purpose of providing TV cable service have a right to place their cables along State Highways within the highway right of way.

### SUMMARY

Under Articles 1416, et. seq. V.C.S., corporations created for the putpose of providing TV cable service have a right to place their cables along State Highways within the highway right of way.

Yours very truly,

Waggoner Carr
Attorney General of Texas

By: Kerns B. Taylor
Kerns B. Taylor
Assistant Attorney General

KBT:km

APPROVED:

OPINION COMMITTEE

W. V. Geppert, Chairman
W. O. Shultz
John Reeves
James McCoy
Robert Flowers
Corbin Snow

REVIEWED FOR THE ATTORNEY GENERAL
BY: T. B. Wright